Good morning. May it please the Court. My name is Jonathan Smith, and I represent the Community and Public Health Petitioners. And I'd like to reserve five minutes for rebuttal today. EPA identifies lead as the number one environmental health threat for U.S. children, and EPA recognizes that the major pathway for children's exposure to lead is lead-contaminated EPA to identify all dangerous levels of lead so that parents and homeowners know whether they have dangerous levels of lead and can act accordingly, and so that other agencies or states can choose to tie their lead regulations to the EPA standards. But EPA has consistently failed to update these standards as required by TSCA. So that's why in 2017, this Court found, quote, insufficient standards that put children at severe risk, and the Court ordered EPA to update those standards to further Congress's goal of eliminating childhood lead poisoning. But the final rule that is before the Court today fails to do so on all counts because the rule continues to deceive parents and homeowners into thinking that levels of lead in their home are safe when EPA knows those about why EPA's rule is infamous. First, I'll discuss why EPA's revised dust hazard standards violate TSCA because EPA set these standards based on its assumptions about the business decisions of some dust wipe testing labs instead of setting the standards based on health only as TSCA requires. Second, I'll discuss why EPA's failure to update the dust clearance levels violates TSCA because EPA has created a system where abatement no longer guarantees the permanent elimination of lead hazards. Third, I'll discuss why EPA's failure to update the paint standard violates this Court's writ because EPA has failed to fully respond to the 2009 petition. And fourth, I'll discuss why EPA's failure to update the soil standard violates TSCA because the reason that compelled EPA to update the dust standard is the same reason that compels EPA to update the soil standard. So for the first point, EPA's revised dust hazard standard is insufficient for the same reason that this Court found the 2001 hazard standard to be insufficient. The hazard standard still declares as safe levels of lead that EPA knows to be dangerous. Under EPA's analysis, the hazard standards it adopted, the 10-100 standards, would result in up to a 32% chance of a child losing over two IQ points and a nearly 10%... Weren't the standards that they adopted the exact standard that Community Voice wanted them to adopt? So in the 2009 petition, a number of petitioners... You can answer that yes or no. Yes, that is the standard that the petitioners asked in 2009 for EPA to adopt. And that was before the CDC did away with the whole idea of a safe level of lead. So that standard was based on science in 2009 under the assumption that 10 would be a safe level of lead. Since 2012, we've known that 10 is no longer a safe level of lead. So the request in the 2009 petition no longer holds because the state of the science shows that the 10 standard should no longer dictate what EPA's setting should be. Are we really focusing here on whether this standard can use 15 U.S.C. 2601C as a part of adopting the standard? Isn't that the big question here? Well, Your Honor, I'll invite the court to look at the D.C. Circuit opinion. The National Association of Home Builders, the EPA case, that's at 682 F. 3rd at 1039. And the court asked that question. And it said that 2601C expressly requires the administrator consider the economic consequences of the action the EPA will take under TSCA. It also aligns with Subchapter 4's educational aims and the promotion of best practices. And that opinion also found that just because 2601C asked EPA to consider costs does not necessarily require EPA to set its regulations under Title 4 of TSCA based solely on what the cost-benefit analysis says. Well, it doesn't have to do it solely. But given that the 2601C is the, if you will, the beginning of this whole chapter and tells what the administrator should think about in determining what to do under the chapter, it can't ignore it, can it? Well, no, Your Honor, but EPA didn't ignore that here. EPA did do a cost-benefit analysis. Oh, yeah, in fact, it didn't ignore it. And based on its consideration of that, 2601C plus 2683, what the statute tells it to do, and looking at the definitions in 268110, it came up with the standard that it has. But EPA came up with the standard not based on its cost-benefit analysis. EPA came up with the standard based solely on its assumptions that some labs might have to business decisions based on a lower standard. Well, so you're suggesting then that I can eliminate my worry about whether they should have used 2601C at all and just proceed to whether it's an arbitrary and capricious violation? So, Your Honor, our major contention is that 2601C does not override the language of 2681. Well, that's what I thought your major contention was. But my worry is that given National Association of Home Builders, which you cited to me, and given that I think Whitman doesn't really apply in this particular circumstance, I'm trying to figure out why 2601C is not applicable. So the issue is that Whitman does apply in the circumstance, Your Honor. Well, I guess I'm trying to figure out why. It seems to me that Whitman, the Clean Air, had two different statutory provisions. One was a standard-setting provision, and the other an implementation provision. Whereas under this statute, there isn't such a, if you will, isn't such a division. And therefore, because of the standard-setting provisions, then I think that they did an appropriate thing to that Whitman does not control, and they used 2601C in an appropriate way. No, Your Honor. Respectfully, here in this case, in this TSCA Title IV, we have the same situation we have in the Clean Air Act. Under 2683, EPA sets the standards, and then under 2682 or other provisions of TSCA Title IV, EPA sets regulations regarding implementation. But if I look at 2601C, which is the standard they used in order to set these standards, and if I look at 2605B4A, which was that which is in conducting a risk evaluation, there they're not to use the costs. So again, I'm saying to myself, this is different provisions than we had when we're looking at Whitman. Your Honor, we have the same language that we have in Whitman. Whitman required EPA to set its air standards. So Whitman required EPA to set standards for what is safe or not for levels of air contaminants in air based on levels that are requisite to protect the public health. And here we have Congress's directions to EPA for it to set standards about what levels of lead are safe or not in dust, paint, or soil based on the adverse human health effects that may result from those levels. It's a parallel language. EPA is to consider health only when setting these TSCA standards, just like it is to consider health only. What is there in this chapter that says the 2601C should not be applicable? What language should I look at? I mean, I couldn't find any. So therefore, I'd said to me, if I were looking at the language of the statute as it is, and I can't find why it shouldn't apply in setting this standard, why shouldn't it? Your Honor, petitioners respectfully disagree that 2601C applies. Well, give me some statutory language that says it shouldn't. You don't have any. The only thing you can come up with is Whitman suggesting that the Clean Air Act is similar to this. Isn't that true? So the language of TSCA 2681 on its face says that EPA is to consider health only when setting these standards. Well, it does not. What it says is that it should consider, and I'll read it, promulgate regulations that identify lead-based paint standards, which are defined as any condition that causes exposure to lead from lead contaminant dust that is deteriorated that would result in adverse human effects as established by the administrator. Yes, so that as established by the administrator language refers to the fact that EPA is to set these hazard standards. These are not hazard standards. Yeah, they are to set adverse health effects standards and take into consideration 2601C. So I thought that one of your positions was that the costs that they took into account were not the appropriate costs relating to testing labs and that sort of thing. Yes, Your Honor, that's right. All right, do you want to go? But isn't that avoiding what we're really talking about? You're really saying we can apply the standard and now we're looking at whether it was an arbitrary and capricious application? Isn't that the argument now, if you're going to get to that? Yes, our first argument is that the standard doesn't apply, but if we're going to apply the standard, then we can look at whether they applied it correctly. Isn't that true? Yeah, if the court disagrees with petitioners that EPA cannot consider factors aside from health, then yes, the court can move to the arbitrary and capricious application. But don't we have to look, don't we have to think about Whitman when we look at 2681 sub 10, which says the term lead-based paint hazard means any condition causes exposure to and there with regard to standard setting, you have a clear statutory provision. And then later on, we get into remediation, which is where you have other factors to consider. But Whitman, it seems to me, requires you to read subsection 10 strictly. Yes, that's right. So just like in the Clean Air Act, in the implementation provisions, Congress expressly says that EPA can consider effectiveness and reliability and safety. Congress does not say that with regard to the standard setting provisions of 2681. Just a minute. The text and the structure of the Clean Air Act is not similar to the text and structure of TSCA. We've looked at the language of the TSCA. If we go back and look at Whitman, the Clean Air Act had two different statutory provisions. One was the standard setting provision, and the other was the implementation provision. That doesn't happen here. It does happen there, Your Honor. We have 2683, which is the standard setting provision, and we have 2682, which is the implementation. All right. I understand your argument. The D.C. Circuit didn't believe it, did it? Well, the D.C. Circuit, notwithstanding what is said about 2601C, it still found that cost-benefit analysis does not control over EPA's regulations under 2682, which are these implementation provisions. Remember, the D.C. Circuit case is not even about the standard setting provisions of 2683. These are the 2682 implementation provisions, which expressly allow EPA to consider reliability, safety, and effectiveness. Is there anything in the definitions of lead-based paint hazard or lead-contaminated dust or lead-contaminated soil which would take away from applying the 2601C standard? So those definitions of those other terms still only refer to human health as the defining factor of what EPA can use when defining… So, again, unless I buy your idea that established by the administrator does not necessarily only affect human health effects but has to go back to condition on lead-based paint hazard, I would come out differently than you would. Is that it? Well, no, Your Honor, because even if you adopt EPA's reading as established by the administrator, that's not what EPA did here in the final rule. At no point in the final rule does EPA say, we are determining this acceptable level of health harm, and we're setting our hazard standards to that acceptable level of health harm. EPA does not do that. This, as established by the administrator, is just a post-hoc rationalization that EPA raised in its briefs for the first time. Maybe we can turn to lead-based paint definition. Yes, Your Honor. Did the EPA violate the WRIT in what they did in this particular matter? The EPA has still not finalized its response to the WRIT. The WRIT didn't say that they had to do it, did they? So in the 2017 proceeding, EPA admitted that these lead-based paint standards were out of date. So EPA— I understand that. I understand that, but I'm trying to figure out where is the language in the WRIT which would suggest that the EPA violated the WRIT in what they did with the lead-based paint definition. So the WRIT requires EPA to fully respond to that petition under the APA, and EPA has not yet responded. EPA has not made a final— Well, it did respond. They responded and said they can't update the definition because of insufficient information. They responded and said that they don't know what the—they're still working on it, basically. They responded and said they're still working on it, but they have given no indication of when they're going to finalize an update to this paint standard. To fully respond to the petition would require EPA to either say, okay, this is what the new level should be, or we've studied it and we find that the current level is fine. EPA has done neither of that. Let me talk about the soil lead hazard standards. Did our WRIT even mention those standards? So the WRIT did not directly address that standard, but the WRIT did say— Did the petition even challenge—did the petition even challenge those standards? The petition for review here, Your Honor? The 2009 petition. So the 2009 petition— Did anybody even challenge those standards? No, Your Honor. But EPA still has an obligation under TASCA to update that petition. EPA didn't challenge the standards, and the WRIT didn't mention the standards, right? Well, it's not—so TASCA is what imposes upon EPA the obligation to update the soil standard. It's not the public's job to remind EPA that it has the standard every few years. Okay, let's go to the clearance level for dust lead. Is that even before us? I'm sorry, what was that, Your Honor? Does the clearance level for dust lead—is that even before us? Yes, Your Honor. That was part of the 2009 petition. Did the 2009 address this issue? It does not, because EPA has not finalized any change to the clearance level. And EPA has set up a dangerous system where even after abatement, which is supposed to be guaranteed to permanently eliminate lead-based— Well, as I look at the clearance levels, it didn't seem to me that the 2009 petition even addressed it, and it didn't seem to me that the opinion was specific as to it. Tell me how it is. We're reviewing this—the action of the agency, and the action of the agency is not to decide these matters together. And I thought that your challenge was that they shouldn't be separating them into a separate rulemaking procedure. So we have various claims about the clearance standard. One under TSCA is that TSCA does not allow EPA to ever have the clearance standard above this hazard standard. And then it's also arbitrary and capricious to consider all of these standards separately when in 2001, EPA explained that it was taking an approach to address all of them together because it doesn't make sense to change one and not the other when they're so interrelated. Right. Okay. You've just about used your time. We'll give you two minutes on rebuttal, but I think we should hear from the Governor. Okay. Thank you, Your Honor. Thank you. Thank you, Your Honor. May it please the Court. Dan Durkee for the United States Department of Justice, representing EPA. I'd like to start by addressing the dust flood hazard standards and giving the Court a very brief background walkthrough of how EPA set the standard, which goes to the legal aspect of the challenge and whether EPA was entitled to consider what it did. And then we can transport over to the merits, the EPA merits, whether the factors that EPA actually considered and how they weighed them were arbitrary or not. And Petitioner's main boils down to an argument that there's no statutory support for it. But in fact, there is statutory support for it. In addition to the purposes of the statute, which we mentioned in our brief, and there was a colloquy about with Petitioner's Council, 2683 of the statute requires EPA to identify a hazard for purposes of the subchapter. 2681.10 defined hazard as any condition that would result in adverse health effects as established by the administrator. Those two statutory phrases together would result as established by the administrator. And ID hazard for purposes of the statute fully support what EPA did. The would result phrase in the statute implies that there's some possibility of any adverse health effect. There's no bright line that says how certain a risk has to be, or could be, such that it would result. Is EPA necessary? But science has established that any lead is detrimental. It's a health hazard. Everybody agrees to that, right? Your Honor, not that it's a hazard. That I think everybody agrees that there is no level that lead exposure is considered safe. That's not the same thing as a hazard. EPA set the level at the 10100 standard, which means that above that standard, EPA concluded that it would result in adverse health effects. Below that, there's still a risk of adverse health effects, all the way down to background, even. But that doesn't mean the same thing as establishing that as the hazard level, because it's a continuum. And EPA had to decide where on that continuum it was sufficiently probable that those risks, which exist at every point on the continuum, can mature into a regulatory standard of hazard. The statute talks about hazard, not risk. But that's not the definition. Tim says lead-based hazard means any condition that causes exposure to lead from lead-contaminated dust, lead-contaminated soil, or paint. I mean, that's just as clear as it can be. Well, Your Honor, I think there is more to it, because it says would result. And that, in EPA's view, necessarily involves some judgment about, well, given that on the continuum... That gives you a problem if you can't get around Whitman, doesn't it? Well, I think Whitman is distinguishable. And we explained this in our brief, but I think Whitman, beyond the framework of the statute, I think the reasoning in Whitman itself shows why this case is different. In Whitman, the court said, well, in Whitman, what EPA argued was that it had to exercise its judgment as to what is requisite. The statutory language in Whitman from the Clean Air Act was requisite to protect. And EPA said that it necessarily had to exercise its judgment about what is requisite, and that's not necessarily limited to health effects. And what the court said at 469 of its opinion, I think is telling, the court said, even if we concede that premise, considering cost is both, and they emphasize both, both so indirectly related to health and so full of potential to cancel the conclusions drawn from the health analysis, that Congress would have mentioned costs. What EPA did here is very different. EPA did not implementability, reliability, and chose one or the other. And like in Whitman, there was a possibility that one could completely cancel the other. Here, EPA started with health. EPA did consider the health risks or the risk of an adverse health effect of 19 different candidate standards. And as I mentioned, concluded that there was some risk at all of those. So then the question is, well, at what point do you draw the line? And that's where EPA took into account feasibility. So feasibility can't cancel and did not cancel the health analysis, which was the Whitman court's concern. Feasibility informed the choice among all of those different potential health, adverse health effects. But you agree they couldn't consider cost, right? Cost, well, and petitioners talk about cost, a cost benefit analysis. That's not really what EPA did. The EPA did do a cost benefit analysis, but a cost benefit analysis is more of a weighing costs. It not only weighs costs and benefits, it brings in considerations such as what's the present value of these costs and economics. There is overlap, but what EPA did was not use a cost benefit analysis. What EPA did was ask, are these standards, are these potential standards feasible? And feasibility is not only in our view allowed by the statute, but it's reasonable to consider because if EPA were to set a standard that was so low, it's not feasible to detect. We could quarrel with their even using the feasibility studies that they did. I mean, given capitalism, you know, the providers would adjust. Some of them had the equipment to move to a lesser standard, a more strict standard. Others would adjust. I mean, it seemed to me that that was the thinnest of rationales of anything they relied upon. Well, your honor, I think the record does support the agency's decision because having the capacity to analyze these wipes, which is how you test for dust lead, it is an important part of the statutory framework. And again, these hazard standards are not set in isolation. They're set for the purposes within the framework of the statute, which is to test whether there's dust lead, analyze that level, and then the homeowner can decide whether to take action. So whether those levels can, you know, and people can take different conclusions from the information of the record about whether there was sufficient information. But I think it's reasonable for EPA to consider the testing side and the reliability side of the equation instead of just setting a number in isolation. And in fact, the record does support that because petitioners in their reply brief, I think, focus on something like, you know, only talking to nine labs, but EPA's survey of testing capacity was much broader than that. And we mentioned this in our brief, and it's in the preamble, but EPA actually talked to organizations that, what's the word I'm trying to think of? Not chartering organizations, but certification organizations that represent a lot of different lab capacity. So even though they didn't talk directly to all the hundred plus individual labs, they did have a sufficient knowledge base that covered enough of the market that they could conclude that about 40% of these labs either would have to make a new investment or exit the market. And that's... Suppose then that they wouldn't make the investment in order to keep the business because the technology is readily available. So it's just a matter of spending something in order to stay in the game. I mean, that seems like a thin rationale. Yeah. Well, your honor, different people might view that evidence in the record differently and reweigh it, but I think it is sufficient to support EPA's decision, even if the court would make a different decision weighing it, or if there was a trial on it, that's of course not the standard. I think for the APA standard to affirm EPA's decision, EPA explained what it was doing, explained what the evidence in the record was, and then explained why that evidence supported its decision. Now, maybe in the court's view, or if this were a trial, that wouldn't rise to 51% convincibility, but that's not the APA standard. Here, I think it's sufficient. What EPA did is definitely sufficient under the standard of review to affirm that part of its decision on the merits. Let me ask you a question. If we get past whether you can effectively use other things except only human health effects, we're at a arbitrary and capricious standard. Tell me why it wasn't arbitrary and capricious for the EPA to accept an adverse health probability that it previously rejected as too high without explanation? Your Honor, I'm not sure what the context, what the probability that the court's referring to exactly that EPA rejected. This is in the context of the dust lead, or in the context of the definition of lead paint? In the dust lead. Okay. Well, I don't... I mean, it seems to me that what they're really doing is that there was a 10-100 standard, and it would have an 8.19% chance of children having a blood level over five micrograms. And then the range considered by the EPA was an exceedance of the probability of 10%. This would result in a child having 2% chance of a BLL exceeding 15 micrograms, and less than 1% of exceeding 20, a level of CDC recommends medical intervention. That's what I'm dealing with. Well, the 8.1 and 8.9% that I think comes out of petitioner's reply brief, I think petitioners and EPA are talking past each other a little bit on that. Those numbers, it's not the way EPA... The numbers that EPA had before it were that on a scale out of every 100 children surveyed, they looked at the 97.5th percentile. So the very top of the percentile, that percentile of the population that was already at high risk, the distribution of blood level was between 7.1 and I think 7.4. That doesn't mean that there's a 8% or 9% or 7% chance that any particular child has that level. It's where on the distribution of expected blood levels that falls and it falls up at the very top at 97.5. So I think there's a difference between saying, what's the percentage chance of any particular child having any particular blood level and the distribution, which is what EPA looked at. And you look at the distribution of among every 100 children at high risk, the very top of that distribution, what's the expected blood level. Does that answer your question, Your Honor? Well, I think it comes near. There's another question. How is it not arbitrary and capricious that the EPA did not provide a reasoned justification for rejecting the DLHS that had higher health benefits? The higher health benefits, I think, when petitioners talk about that, they're pointing to, I believe, the economic analysis, which found benefits at a potential standard of 540 instead of 10, 100. But that economic analysis on its face says that it made a lot of assumptions. It was not an analysis that was designed to choose between those two standards. The analysis said that it's assuming that all these reliability concerns, all these concerns about test capacity in the laboratories was taken care of. And I can give you the site to that. But that's not looking only at that preliminary conclusion in the economic analysis we submit is ignoring the context of what that economic analysis was doing. And I think we have the site in our brief, but if not, I can give it to you since I put my finger on it, where we say that I think it was excerpt of record 983 to 984, where it explains that the economic analysis assumed that there was sufficient capacity that the labs would in fact purchase the equipment and continue testing. None of the labs would exit the market. But didn't the National Association of Home Builders in 682 fed 1032 in 2012, didn't the DC circuit say that economic cost isn't part of the story? They looked at the statutory background and said, recognize that amended TFCA in 1992 to authorize regulations addressing lead paint hazard and instructed the EPA to take into account reliability, effectiveness, and safety, but didn't mention costs. Well, your honor, I think again, there might be this kind of blending between cost benefit analysis and reliability. Reliability, yeah, necessarily reliability and capacity is going to require some inquiry into cost, but it's not really the same. Asking whether a standard can be reliably met is not the same thing as saying the cost of that standard or the benefits of that standard outweigh one or the other. It is a similar analysis, but we submit that that's a distinct analysis and that what EPA did was not really weighing, again, not really weighing costs versus benefits to choose a standard. It was looking at the range of potential standards all informed by potential adverse health or risks of adverse health effects and using reliability as one of the tools to decide which one met that implies some kind of discretion to choose. Well, at what point does it transfer into from may affect or could affect to would affect? And that's what EPA did here, your honor. Let me ask you another question, unless my colleagues have a question. When we go to lead based paint definition, it seems to me you come back and say we don't have significant, there are significant data gaps and feasibility enough to do it. We can't do it. That's the same thing that you said on the 2009 petition for rulemaking. It was the same thing that was in the red. Now, here we are the same stuff. Seems to me you've created your own problem. Why not force you to get this done? Well, your honor, it's not that it's not a situation where EPA hasn't done anything. Well, what's it done? The same thing you argued on the last time we were here, and I didn't necessarily go along with the majority's decision, but the honest truth is I got the same argument here and the majority said, get it done. And now it isn't done again. Why should I give you another chance? Well, I have two responses. One more general response and one that's record specific. The general response is just because at point A in time, EPA or any agency says we don't have sufficient information, doesn't mean that point A plus X number of years, EPA or the agency necessarily has the information. It's perfectly. Why doesn't it get the information? Well, and EPA is working on that. That's what we got. That's what you said the last time we were here. Yes, I understand that. And we said, let's do it. And yet we gave it time and it was went through the whole rulemaking and you don't do anything. But I urge the court to look at the reasons EPA gave why it said it didn't, that the information was not sufficient. EPA just didn't just throw up its hands and say, we still don't know. For instance, in the record, in supplemental excerpts of record, there's a lead based paint considerations document, which is a 2019 document and it may have 2019 where EPA explains how it surveyed existing literature on the definition of lead-based paint and identified the areas where that literature in EPA's view was not sufficient and explained why, explained not just in general terms that, oh, we don't have enough information, but the specific kinds of concerns that were not answered that would require additional analysis, modeling, testing of the models. Well, how much more years do they estimate that this is going to take? Don't they have an ongoing, are they still doing something? Are they done? EPA is still talking with HUD about this. They noted that in the preamble. I think it's excerpts of record 12, column two, I believe, but I can check that where EPA said that they are continuing to talk with HUD, which also has a role in the definition of lead-based paint. How long, what that end point is and how long it's going to take, I can't tell you. There's an old song, Sleep at the Wheel, and it just looks like that's where we are. 2017, we were here, we're hearing the same thing now. And we even in the RIT said, if you need additional time, come back to us and let us know. And whatever you published, you did, and that's it. We really don't know that you're doing anything else, other than you started a separate proceeding with regard to remediation. I understand that, but the way that EPA views this, the way that I urge the court to view this is EPA was asked the question, was told to answer the question, is the definition of lead-based paint adequate? And in the 2019 rule under review, EPA said, we don't have enough information and explained why. Now, if the reason that EPA gave is insufficient, that's a violation of the EPA, that's arbitrary confusion. But if that's a reasonable explanation, or frustrating it may be, if that's a reasonable explanation, I submit the proper course is the court affirms the decision. And if petitioners or anyone else is still unsatisfied with that, or in a year or two years, or whatever point in the future, they say, look, it's been enough time. The right answer is not order EPA to do something that it doesn't have the information to do. The right answer is petitioners or some other group, again, petitions EPA, and hear me out, again, petitions EPA to change the definition of lead-based paint. If EPA says no, that's again, a reviewable final action. We start all over again. That's true. But the problem comes, counsel, and this is what my colleagues, I mean, I know where I was the first time, but my colleagues came down with an order. It seems to me that this was the exact thing that was raised in 2009 for rulemaking. It was an issue in the writ. Every time we get this, we get the same explanation with the same basis. Now that isn't just since 2017. That's since 2009. We've had over a decade for somebody to do something and they've done nothing, except come back and say the same old thing. There's still data gaps. We still can't put in feasibility, no new basis whatsoever. So one might argue what you're saying as to 2017, but this is the same thing I saw in 2009. Your honor, the difference is that EPA complied with the writ by making a final decision, a reviewable decision with a record that's now before the court that said, here's why we don't have enough information to make a decision on whether the definition of lead-based paint is sufficient or not. Not that it's safe or unsafe, like Petitioner was saying. I don't think that's the right question to ask. The question is, is there enough information to conclude? It's enough to comply with the writ to say we're going to do nothing. Well, if that's all EPA said, that would be a different story. But respectfully, that's not what EPA said. We're going to do nothing yet. Well, EPA made a final agency action with an administrative record that explained why it felt it didn't have sufficient information. Now, again, if that record doesn't support the decision, that's one thing, but that's different than saying you're over time. But it's of some interest to me on soil lead hazard standards. It may not have been a part of the petition. It may not have been a part of the writ. But it seems to me the EPA has an ongoing statutory duty to identify any conditions in soil lead that could lead to adverse human health effects. And they have done nothing. Seems to me they have a continuing duty to do something. Why shouldn't we put out an order this time that says do something? Maybe we don't give you the same 90 days and finish in a year. But why don't we say do something? Nobody's done anything. Well, your honor, EPA did explain in this is excerpts of record 648 that soil lead is a very different substance. It's measured differently. It's got different impacts on lab capacity. How long since we had a change? How long since we took the duty to do something about it? 2001. Come on. I read there are many uncertainties with lead. It's measured differently, has different parameters, bioavailability, intake, activity patterns, would require a different cost analysis on remediation. Intervention would be separate and apart. But good night. It seems to me somebody's got to move someday. 20 years? And, you know, back in 2002, once again, the DC circuit pointed out that you have to go into soil. You have to go into dust because it's all part of the package. And the EPA was being quoted there back in 2002 that you have to be able to look at all of those factors. And here we are just saying, well, we shouldn't even look at soil or, well, for one thing, soil at all. And in 2002, they recognized in front of the DC circuit that they definitely the different media are clearly connected. But EPA's answer to that argument is that if the reasons EPA gave in its decision are reasonable and supported by the record, even if it's a frustrating answer to some, if the reasons EPA gave while it was not prepared to revise soil lead, while it was not prepared to revise the definition of lead, if those are supported in the record, the APA demands that that be, the APA standard is that that should be upheld. Okay. Could I just, could we go back for just one minute? You're way over time, but I just want to make sure I understand your argument with respect to the hazard standards. Do I understand, we're going back to the beginning. Do I understand your argument to depend on your interpretation of the statute requiring that the identification of any condition of dust lead that would result in adverse human health effects as established by the administrator to mean that the administrator, that this is the administrator establishes the adverse health effects and identifies the health effects and not the conditions. Is that right? I think the answer is yes, your honor, that the phrase as established by the administrator modifies any adverse health effects. Yes. And not, not condition. All right. Thank you. Thank you. All right. If there are no further questions, then we'll hear rebuttal from Mr. Smith and we'll give you, we'll give you a couple of minutes. We won't cut you off in the middle of one syllable word. Thank you, your honor. I'd like to make three quick points. First, the national association of homebuilders case was about EPA's rulemakings under 2682. And there's no dispute that EPA can consider factors aside from health under 2682. But what we're talking about here for most of the cases, 2683 rulemakings about what the hazard standards should be. And here we have the same Whitman dichotomy of EPA setting the hazard standards and then in a implementing those standards. And for the second point, I'll stress that EPA's reliance on this lab capacity reasoning is just retroactive justification for EPA to use the same hazard standards that have been proposed rule and not make any changes with the final rule. I'll invite the court to look in the record at ER 1030, where EPA explains how it derived this 40% number. And it did that by interviewing just eight or nine labs. And EPA expressly says that it to measure at the lowest levels, but EPA discounted that lab from its calculation because they call the quote an outlier with no other explanation. And for the third point, I'll remind the court that EPA has never taken action on any of these standards without judicial intervention. The 2001 standards were issued only after he was sued. And this court knows that the 2019 rule came only after this court's writ. And I'll point the court to the DC circuit opinion at Center for Biological Diversity, the EPA at 722F3R10, where the DC circuit said it's arbitrary for EPA to simply thumb its nose at Congress and say that it does not intend to achieve a congressional goal on any timetable at all. That is exactly what we have here. EPA has given no timetable about when it will update these paint or soil standards. For these reasons, we respectfully ask the court to remand the final rule to EPA without vacatur so that EPA identifies all dangerous levels of lead as TSCA requires. Thank you. Thank you. Are there any further questions? All right. Thank you, counsel. We thank both counsel for their arguments in this very interesting case. The case just argued is submitted for decision and this court for this session stands adjourned.
judges: Schroeder, N.R. Smith, Piersol